Good morning, Your Honors. May it please the Court, my name is Kate Stetson, representing the Hartford. I'd like to set aside for rebuttal three minutes, if I may. To begin unpacking the issues in this appeal, I think it's helpful to start with California Civil Code 1636, which is the state law provision that instructs courts, when they're interpreting contracts, to interpret them so as to give effect to the mutual intention of the parties as it existed at the time of contracting. The problem with what the Bankruptcy Court and the District Court did here, however, is that they both construed the relevant contract here, which is Section 14.1 of the parties' settlement agreement, to give effect only to the unilateral intention of one of the parties, as it was alleged to have existed at the time of contracting. That's the core error in the case. So I want to start with Section 14.1 and what it says. Section 14.1 is what's commonly referred to as the audit right, or the audit and review provision. And it sets forth, among other things, some specific restrictions on Hartford's use of documents obtained during an audit. There are two restrictions that are specified in Section 14.1. One of them says, Hartford, you may not use these materials to challenge any trust payments. Restriction 2 says, Hartford, you may not challenge – you may not use these materials to challenge any trust administrative payments. Don't say it's an exhausted list, though. Exhaustive list. Your Honor, we maintain that it is an exhausted list. You could use this for anything you wanted to, as long as it wasn't one of those two exceptions. Within the bounds of other Federal and State privacy restrictions, yes, Your Honor, and this is why. If the parties had intended for these documents to be used only for a particular purpose or even two purposes, they could have written the provision that way. They could have written it as restrictive rather than permissive. But what you have here is, Hartford, you have a right to audit and review subject to reasonable notice, subject to time and place agreed upon by the trust. But you cannot use these materials for two important purposes. You can't challenge payments and you can't challenge administrative payments. Now, in the adversary proceeding that the trust parties filed, they sought, in addition to those restrictions on use, a series of additional restrictions. And I want to read them because I think they're helpful. Hartford's audit right is limited to financial information. Hartford's audit right does not include claimant-specific settlement information. Hartford may not use the audit for purposes unrelated to this bankruptcy case. The bankruptcy court rejected a couple of those proposed amendments, but it accepted that additional use restriction. Would it be implied in law that the privacy rights are part of every contract? Your Honor, I think it's a – I think it's an open question whether in this case there are any privacy rights that are left that couldn't be contracted away. Because, of course, you have the – Well, they can be contracted away, but if they're not contracted away, isn't it – I don't want to say as a matter of law – isn't it just sort of a given that anything you do, unless you waive privacy rights, which are legal rights which you have regardless of what you do, that it's built into any contract? I think, Your Honor, I can concede that there are – and we've conceded since 2007 when this marathon started – that there are privacy rights that adhere in some of this information, and that Hartford has consistently, from the very first letter it wrote to the trust, committed to keeping that information confidential and private. As we described in our reply brief, we think the issue on the privacy side boils down to a relatively narrow set of materials, materials that the trust already has conceded we can disclose to the reinsurers. So I continue to think the core issue is not a privacy issue. That is somewhat of a red herring. If a claimant has a bodily injury or disease that's embarrassing, and what business is of anyone what their personal, physical or mental or disease history is, except for purposes of the trust? Judge Callan, I agree with you that if the medical history that we're talking about is history that's not relevant to the asbestos claim, that information is private, it's delicate, it's confidential, and Hartford has consistently committed to keeping it confidential. So that's not the information that's at issue in this case. Understand as well that this bankruptcy judge, Judge Tchaikovsky, in her ruling, went further than any other bankruptcy judge to have confronted the question about how materials can be used during or after an audit and review. Take, for example, by comparison, the Babcock and Wilcox judge, the Federal District Judge in Louisiana. Scalia, what did she, Judge Tchaikovsky, depend on for her interpretation? What she depended on for her interpretation, Judge, was a hearsay statement offered by a person, not a direct party to the negotiations, that one of his colleagues had told the lead counsel for Hartford that the trust would not agree that Hartford could use audit materials for any purpose unrelated to the trust. That's the declaration, by the way, just to be clear, that came in during the summary judgment motions. There was a separate declaration by that person, named McClain, that came in in the separate first filed proceeding, a motion to enforce the settlement agreement. But, you know, this is an interesting case to unpack, if you think about it. Because our primary argument is that the section 14.1 is unambiguous. It says what Hartford may not use the materials for, and by the way, it's not just an audit. So unambiguously, it says Hartford shall have the right to review and or audit the trust. Where does it give it the right to disseminate the information to other insurance companies? Your Honor, I think the focus is under the unambiguous language that you're referring us to. It needs to be reviewed, Your Honor, in as a whole. What the provision goes on. It's not just completely unambiguous. We have to, you would have us construe that term. No. I think we're talking across purposes. Review and audit, and the emphasis that's placed on review and audit, particularly below, was especially important because of the additional limitations that the trust parties were at one time seeking to impose on the words review and audit. You can only look at financial information. You can only look, you can't look at claim settlement information that's non-financial and so forth. Our point with respect to the rest of the provision, however, is that by specifically embedding in that provision restrictions on use, the provision does not, therefore, include a third restriction on use. That is an additional term that these trust parties are seeking to add to the contract. And no matter what California's view of use of extrinsic evidence to interpret contract, one thing has been consistently clear since Judge Treanor's opinion in 1968, which is that you may not use extrinsic evidence to add a term to a contract or to vary a term to a contract. You can only use extrinsic evidence, setting aside, Justice Schema, your question about whether it's admissible at all. You can only use extrinsic evidence in order to find if there's any latent ambiguity lurking within that contract. There's no latent ambiguity. Roberts. Roberts. The Hartford claims the right to take, get this information and pass it along to other insurance companies? Do I understand that correctly? Your Honor, it's a difficult question for me to answer for two reasons. The first is we have not yet seen any of this material. We don't know what use we may have for it. The second reason is. Well, whether you decide to use it or not, that's not what I'm asking you. You claim you have the right to do that, though, right? We claim under the provision as it was agreed upon, yes. Okay. I don't see where you get that out of review and or audit. We get it out of the entirety of that review and audit provision. We can review and audit, and as Judge – as the Babcock and Wilcox judge explained, part of reviewing and audit means that a company like Hartford has the ability to commit this material to what that judge called its institutional memory and to use that material within the company, something, by the way, that Judge Tchaikovsky forbade Hartford from doing. So you would say review and audit means review, audit, and use for any other purpose that it deems fit. That's how you would interpret that phrase. Your Honor, I would interpret it that way because of what follows review and audit. It says Hartford can review and audit subject to all of those limitations. Hartford may not use for purpose X. Well, it says they don't have to create new documents and they can't challenge the payment, but you have given an expansive reading to review and audit to include review, audit, disseminate, remember, perpetuate. You would add a lot of stuff to your unambiguous language here. No, Your Honor. I think it's the trust parties who are adding a lot of stuff to the provision. But there are those ones who want to do more than review and audit. Your Honor, review and audit, particularly the word audit, as we've explained in our briefing, is a very expansive word. But more important, this particular provision doesn't just say review and audit. It says you can review and audit, and here is how you may not use the materials that you gather during your review and audit. There is no rule of contract interpretation that says that when you specify what you may not use those things for, you also have to specify what you can use those things for. Are you referring to the CEPI declaration now about what an audit means in the insurance context? Is that what you're referring to? No. I was not referring to the CEPI declaration, but I'm happy to discuss that. Well, where does the definition of what an audit consists of, an insurance audit, come from? The definition of what an insurance audit comes from, I was referring to a general principle of contract interpretation. The CEPI declaration, you're quite right, speaks to the type of information that is sought. And I would commend you. I misunderstood you. I'm sorry. I thought you said there's a difference between a financial audit and an insurance audit. No. What I meant was, what I said was, if a contract specifies what you may not do, it doesn't also, in order to be a full, fully integrated contract, need to specify what you can do. Well, is it your contention that when they use the term audit, it means something other than a financial audit? Yes. That is absolutely my contention. What is your basis for what an insurance audit is? That comes straight from the CEPI declaration. And where does CEPI say they can disseminate the information to other companies? What CEPI says at paragraph 6 of his declaration, at Record Excerpt 111, is that, among other things, a trust or an insurance audit can be used for the purposes of ascertaining whether those claimants have submitted claims. And I'll get the language in front of me as well. Obtaining information regarding claimants. That may seek to recover damages from other parties for the same or similar claims. Where does it say there that they can disseminate it to other parties? Your Honor, CEPI never said that. But importantly, what the bankruptcy court and the district court took CEPI's declaration to mean. And you saw, I trust, the bankruptcy court's declaration that she gave the Guy declaration more credence than CEPI's. What CEPI explains here is that among the purposes of an insurer audit is to make sure that the claims that are being submitted to one trust match against the claims that are being submitted to other bankruptcy trusts. There are many, many of these bankruptcy asbestos trusts. Hartford has funded many of them, although none of them to the tune of $1.15 billion as it did here. One of the amounts. And you also tried to get this kind of information in other cases involving other trusts, apparently not too successfully, right? Well, I would resist that a little bit, Your Honor, because of the nature of the draconian restriction that Judge Tchaikovsky imposed here. If you compare it again to the Babcock and Wilcox court, the Babcock and Wilcox judge made it clear that Hartford could both copy, retain, and use within Hartford the information that it obtains. Now, it is, I grant you, a separate and a subsequent and very highly conditional question whether or not Hartford would ever need to disseminate to a court or to another information that it discovers. And if that occurs, as we've said, Hartford has committed to keeping confidential private information. It will not disseminate confidential information. What we are seeking to do is something that Judge Tchaikovsky forbade us from doing, which is using this material for our own internal purposes and, if necessary, with all of the appropriate protections in another proceeding, in a tort proceeding, in a bankruptcy court, or so forth. Thank you. You've got about a minute and a half left. I know you wanted to reserve some time. Yes, please. Thank you. Thank you. Good morning. Good morning. May it please the Court. My name is Stephen Sachs. I'm going to speak on behalf of the appellees this morning. All the appellees? That's correct, Your Honor. In this case, the Court, on the one hand, is presented with what seems to be a straightforward contract interpretation dispute with issues about summary judgment and extrinsic evidence. On the other hand, this Court's decision will determine whether many thousands of documents containing the most sensitive confidential medical information are released for the first time from confidentiality restrictions that have always protected them. And those documents would then be released without those restrictions to a large insurance and financial services firm that could do with them what it wishes. Well, what they're going to do is see if you're making double claims or see if there are similar claims which have been made for the same injuries. I mean, that's no surprise to you that a carrier would want that information to see if they're being double billed. Well, this carrier cannot be double billed because it has paid. It gave up its insurance obligations. It gave up in this settlement the right to check trust claims. It cannot do an insurance audit. We especially resist that proposition by Hartford, that it is entitled after it settles, after it says it won't challenge the trust claims, the right to go and look exactly at what it wants to do. Well, if it can't do an insurance audit, what kind of audit does that language in the agreement refer to then? It refers to the language about payments being made in connection with asbestos-related claims. That's why Hartford said they wanted this audit, and they haven't denied that. They wanted it because in order to get reinsurance, they had to show those reinsurers that they made the payments in connection with asbestos claims that were covered under those policies. But I don't understand why that would require an audit of the underlying claims. Well, it probably doesn't require an audit of the underlying claims exactly, and that's why we asked for the things we did from the bankruptcy court. But you still haven't explained to me what kind of audit the contract refers to if it does not refer to an insurance audit. Well, it refers to an audit that would determine that trust monies were paid out either for administrative expenses or directly to claimants. And if Hartford satisfies itself that it paid out money in that fashion, then it really doesn't need any more audit than that. That's more like just a regular CPA's financial audit, isn't it? That's correct. And that's what we understood. Is that your position, that that's what the term audit used in this agreement means, just a regular financial audit? Absolutely. If you look at the drafting history of this agreement, it started from a discussion about what the money was going to be used for. Hartford first said, well, you have to use it only to pay asbestos claimants. And we said, well, we can't do that. We have to be able to pay the trust employees. We have to administer the trust. So they said, okay, you can use it in connection with administrative connection with asbestos claims. But we want the right to audit that. And so the term sheets had these two things linked together. Only in the final document, after the series of term sheets got passed between the parties, Hartford drafted a settlement agreement that put the audit right in its own paragraph. But no one ever discussed that by doing that, they were somehow getting more rights than they started with. Well, they rely heavily on the fact that you signed this agreement and were only two exceptions to the way they can use this information, and not one of them being that they can't cross-check to see if there had been double claimed or double billed. And it certainly would be no mystery to anyone in the claimant business to know that carriers are always interested in whether they're being billed again for the same injury, and it's not accepted from the agreement. So a strong argument is made here, if it's not accepted, it must be used. Well, it is not accepted because no one would have understood that that's what was contemplated by a review and audit. And instead, as the Court said earlier, there was a real understanding that these records had confidentiality restrictions from the beginning. After all, Hartford agreed at the time this bankruptcy commenced that these were confidential medical records. In entering into a protective order to cover them, they stipulated that these records were entitled to confidentiality protection. Yeah, but that's just a discovery order. It doesn't apply, you know, to afterwards. And that's what the judge said. Well. The protective order. That's correct. The protective order needed to be replaced by something else. Here the records went over to the trust. These same records, claimants filed claims in advance of the bankruptcy, intending that those claims would be processed once the bankruptcy was completed and the trust was established. Hartford got those records during the bankruptcy subject to a protective order. The records then went over to the trust. Hartford couldn't use them under the protective order. It now says we can take those same records and more and use them in any way we want because the litigation is over. It hardly makes sense that you'd protect the records of this kind of confidential nature only during litigation and somehow have them lose their confidentiality protection once the litigation is over. Let me ask you. Even if we agree with your basic point, it looks like the injunction may be overbroad in the sense that it requires Hartford to destroy or return whatever it reviewed, including whatever it gave to the reinsurer. And I'm concerned whether they are entitled to, you know, maintain a paper trail to be able to prove what they gave or what they did. Well, there's a provision in that in the injunction, for that in the injunction. No. You're talking about paragraph 8D of the injunction? Let me get it in front of me so that I'm sure which paragraph I'm talking about. Is that the six-month limitation? Yeah. After they have to they can give the stuff to the reinsurer, but then they have to destroy whatever they've or return whatever they've obtained, except that they can give records to the reinsurer. Right. Or they may come in and ask for permission to keep things longer or forever if they need them to document for the purposes of the audit. I mean, why can't they maintain a paper trail of what they've done? I mean, I don't understand why they... Right. So it's without prejudice for Hartford's right to come back if they need additional time or... Exactly. And it made sense to have some limitation on this because, after all, Hartford was given much broader access to these documents than we thought was proper. Well, it's built into the agreement that they can come back to court and ask for additional time. Of course. As with any injunction... Beyond the six months. ...it could be modified if there was a real need to have them longer. We said six months. The Court agreed with that limitation. Hartford said you can't limit us at all. We get to keep these in our files forever. It didn't seem appropriate to us. But if you need an audit trail, if you have some need that it's going to take nine months or a year, that situation hasn't come up. That situation hasn't been presented to the Bankruptcy Court, ruled on, and brought up to this Court. So I don't think the injunction can be overbroad or determined to be overbroad at this juncture until that issue is properly presented. I want to come back to the issue about what protection Hartford was willing to offer us. First of all, in Mr. Bowman's first letter to the trust, it did not offer any confidentiality restrictions at all. But what it did do eventually is say, well, if there are statutes protecting this information, we'll, of course, abide by those. Hartford's never pointed out that there are such statutes. If there were statutes, we wouldn't be here. We wouldn't need to have a private agreement or a court injunction that protects this information. So for Hartford to say, well, it's all covered because we'll abide by statutes, does absolutely no good for the beneficiaries of this trust. Turning back for a moment, at least, to the aspect of this contract that is so important, I think, in understanding it, this was not intended to be an insurance contract. We're not reviewing an insurance policy in this case. Hartford wanted to make sure that by entering into this new contract, it wasn't taking on some new insurance obligation, that it wouldn't be construed against it. And so this contract specifically says it's not an insurance contract. It won't be interpreted that way. So for Hartford to say, well, we have no more insurance obligations, these policies are fully bought back, as the contract says, but yet we get to do insurance audits to protect against double billing or something like that, that's not the idea. They paid a lump sum of money. It did not pay per claim. They didn't say we're only paying for these claims and not others. They gave up all of that. They said we're not going to defend you. We're not going to pay on a per claim basis. We're done here. And I think that's very important to understanding what happened. The Court in Babcock and Wilcox, I think, gives this Court a very nice expression in understanding what review and audit means. The Court said that nothing in the word review suggests a right to unfettered use or an unlimited right to share, and that they pointed out that all the definitions that the parties offered concerning review focus on the intake of information rather than the output of information. So it's not what you get to do with it that is encompassed in a review and audit. It's what you get to look at. And here, there's no dispute. Hartford gets to look at everything. It wasn't our idea, but that's what the bank said. I mean, they get to look at it and not do anything about it. I just satisfy their curiosity? I mean, what's the point of this? Well, they can use it for trust purposes. So if they – Like what besides reinsurance would come under that? Well, they could come back to the trust and ask questions about something that they have. They could – Give me an example of what you're referring to. Well, they could say this claim appears to have problems. We want you to know about this. I thought they can't challenge the claim. Well, they can't challenge it. But there is a – you know, for the trust purpose, they want to come to the trust and do something there. Is there any trust purpose besides reinsurance that you can think of? No. I think that that's probably about it. But they have not expressed that they have. This was not really an issue before the court below, because Hartford always took the position we can use it for any purpose. Even today, Hartford doesn't take the position that it knows what it wants to do or that it's limited in any way. So how are we to say, well, we've looked at certain purposes we're going to rule on? We looked at this at the time. The court looked at it and concluded, based on its knowledge of this dispute from the beginning, that it was appropriate to say we're going to limit it for now to the purposes of the trust. If you can show us that you need it for something else, sure. Again, you can come back. You can ask for a modification of this injunction. Hartford has argued, at least in its briefs, that this matter has to be remanded for trial because there's allegedly a disputed issue of fact. If there's anything I think that's clear on the record is that Hartford waived any right to make such a claim below. It's not even just a situation where they didn't raise a point, a legal issue, and now they want to raise it to you and argue that it's so important it should be considered. But this was a matter that directly affected how the bankruptcy court ruled on this issue. Hartford said over and over, there are no disputed issues of fact. You should rule as a matter of law. I want to come back to confidentiality. In this case, the claimants were not parties to the settlement agreement. This is not a situation where certain claimants settled their disputes with Hartford and were paid money and gave a release. If you look at this settlement agreement, who the parties are, the parties are the debtors, on the one hand, certain law firms represented that they would tell their clients to file trust claims, the committee of creditors, the futures representative, but not the claimants themselves. Instead, the claimants submit their claims to the trust, and when that claim is accepted, when they are paid, they then sign a specific release of Hartford. That's in the record. We offered declarations by claimants showing that they did not consent and that the release, it's only in the release that they sign after they submit a trust claim where Hartford gets a release from them. So to interpret this settlement agreement as containing a release of other people's confidential information would be inappropriate. Finally, I want to conclude by saying that the court below, which, as I say, was entirely familiar with this dispute, having ruled on it from the beginning, having indeed approved the Hartford settlement agreement at the time it was presented, the court interpreted the contract correctly as a matter of law that Hartford only gets an audit as that's generally understood. We think you don't have to go to the extrinsic evidence. We think that the extrinsic evidence supports our interpretation of the contract, but we think the plain meaning of this agreement, of review and audit, as Hartford asks the court to look at the plain meaning, that it doesn't extend to the kind of things that Hartford wants to use it for and the kind of dissemination that Hartford wants to make. Hartford's not aggrieved by these limitations that are in the agreement. I'm sorry, that are in the injunction. If Hartford wants relief, it can come to the court, the bankruptcy court in the first instance, and seek relief. Thank you very much. Thank you, Mr. Sachs. Ms. Stetson, you have about two minutes left, I think. A minute and a half. Thank you, Your Honors. A couple of quick points. You heard Mr. Sachs argue that the interpretation of the agreement was based on the party's understandings, something what Hartford said at the time of the agreement and what the term sheets suggested. The way that you ensure that something is in agreement is to put it in an agreement. And just to walk you through what I think are the sort of series of deficiencies in the Court's rulings. Deficiency number one, what the trust parties are seeking here is to add a term to this agreement. Deficiency number two, the extrinsic evidence, such as it was, that the parties relied on was hearsay. Deficiency number three, even if you get past the notion that those declarations were not something other than pure hearsay, what you are left with is, let's call it an undisputed recitation of one party's unilateral intent that something appeared in an agreement. And just to be very clear, the Brayton Declaration, if you review it, notes that the parties, that the trust parties sought for there to be a provision in the agreement specifying that Hartford could not challenge, as you observed, claim payments. That's in the agreement. The declaration also states that the trust parties said Hartford may not challenge administrative payments. That's in the agreement. The Brayton Declaration goes on to say they sought an agreement that Hartford would not use the materials for any other purpose. That is not in the agreement. And there is significance to that. The only way the bankruptcy and then subsequently the district court backfilling was able to close that gap between the unilateral intention of the trust parties and a finding that it was the parties' mutual intent that this hidden provision, B in section 14.1, was by concluding that Bill Bowman's silence during negotiations was consent. I submit to you that if that's the case, all contract negotiations in California are going to be an entirely different affair than they are now. Thank you, Ms. Thank you. Mr. Sachs, thank you, too. The case just argued is submitted. We have some folks here on American Marine Corp versus OWCP. Are they in the courtroom? We're going to need to take a short recess so we can get the video set up. So we'll come back as soon as that's done. Thank you. We'll stand in recess for a brief moment.
judges: Cowen, Tashima, Silverman